May it please the Court, my name is Steve Berman and I represent the plaintiffs in this case. This morning I'd like to address three issues, and the rest reserve on the briefs unless there are questions, and that is, in this order, the political question doctrine, the active state doctrine, and the issue of exhaustion. Let me start, if I may, with the political question doctrine. We submit to this Court that this case does not present a political question. If you look at the case, the issue of when a political question arises, to me, in studying for this argument today, the dominant analysis that the courts engage in is this. Is there a textually demonstrable constitutional commitment of the issue in question to the judiciary? If you look at Nixon v. U.S., Japan whaling, the Keita case, that's all, that's where they come out. They want to look for that textual commitment. There is an unequivocal textual commitment of the claims raised in this case to the judiciary, and that's in ACCA, the Alien Tort Claims Act. The Ninth Circuit, as has every circuit that's considered this issue, has found that ACCA textually committed to the judiciary the task of deciding violations of international law, such as the violations alleged. And I believe the political question doctrine talks about a constitutional commitment. It's a textual commitment by the Constitution of an issue to one branch of the government. Your argument about the textual commitment, of course, is a statutory commitment by Congress to the judiciary. Well, first, the constitutional commitment to make laws was committed to the legislative branch. The legislative branch, using its power, then gave that responsibility under ACCA to the judiciary. Once the judiciary has that responsibility, then there's a constitutional commitment to decide cases that arise before it under the laws of the United States. This case arises before the judiciary under the laws of the United States. Therefore, if you look at the cases of Marcos, Unical, and Alvarez, they all say that these cases have been textually committed to the judiciary. So that's our starting position. And into that background, of course, comes why we're here on this motion. It's a statement of department. And we submit to the Court that the State Department's statement of interest, no matter how sincere, can't transform a political issue or a concern of the government into a political question. And my starting point for that analysis is actually the Alvarez and Bank decision, which the Ninth Circuit recently decided. Judge Fischer was on that panel. And there I think the Court hit it right on the head, this issue. In footnote 7 at page 24 through 25, and because it's important enough, I'll take a moment, with all due respect to the Court, to summarize it. What the Court says is that the mere fact that the case raises politically sensitive issues connected to our foreign relations does not preclude us from carrying out the legislative mandate of Congress, giving us authority and the power to do so under ACCA. And then the Court went on to say that there is a critical distinction between, on the one hand, second-guessing foreign policy judgments, to whom the decision to make those judgments has been assigned through other branches of the government, and reviewing claims based in tort and brought under Federal statutes, instructing the judiciary to adjudicate such claims. Well, as in the Alvarez case, we have tort claims here that have been brought under the laws instructing the judiciary to adjudicate those claims. Right. But can I just interject? Alvarez-McCain involved a claim that the United States itself had violated international law. Doe involved a claim that a United States corporation had violated, Doe v. Unocal, had violated international law. This case involves a plaintiff from Bougainville, original now states, but all of the actors are external, largely, if not entirely, largely external to the United States. So the Alvarez-McCain footnote is an expression of generalization in the context of that case. Are you suggesting that Alvarez-McCain's footnote 7 anticipated this case and said that once you come within the jurisdiction of the ATCA, the political question doctrine disappears, or what? I think what Alvarez says, Your Honor, is that you have to make a very careful distinction between what's a political issue and what's a political question. And even though there may be an impact, as Baker v. Carr points out, on foreign relations, if ultimately the issue is one that's been committed to the judiciary, which it has been in this case, there's been no, for example, motion that there's a lack of personal jurisdiction because Rio is an English corporation. We have a resident of Los Angeles who's the primary plaintiff. So the case is what I'm suggesting is the case has been committed. And therefore, if it's been committed, the primary question is, is this something that courts are supposed to grapple with? Mr. Berman, I'd like to follow up on Judge Fischer's question because I don't think you've answered it. It's a question that I'd like to ask one more time. Is your contention that by virtue of ATCA that the political question doctrine is not applicable in any case to which Section 1350 has been invoked? The political question, that's not my position. My position is that first you look to see whether there's this textual commitment to the issues that have been presented. For example, in the slave labor case and in the Nazi cases that are cited, there was a textual commitment to decide issues like these to the judiciary. There was also a textual commitment to the executive to negotiate, to finalize claims of people subject to war crimes in those treaties. In that case, there was a prior decision by a branch of the government that had the power to make that decision, negotiate a treaty with Germany and Japan. It made that decision in step to judiciary. That's a harder case because both judicial branch and the executive branch have rights that are conflicting. In that circumstance, the Court has to weigh the other Baker factors and found in both of those cases that there was a political question. Why isn't the answer on the political question that the textual commitment here to the executive, of the power to appoint ambassadors to be, as the Supreme Court has said, the single voice of the United States in foreign affairs, why isn't that sufficient for us to at least raise a very serious question as to whether the executive branch doesn't have sort of a lead on this one? Because the power to appoint an ambassador has nothing to do in all due respect to that branch of the government. But that has been, but the Court has previously said, for a long way back, that that is the source of the foreign affairs powers. That and the power to appoint ambassadors, to receive ambassadors and so forth, is the commitment in the Constitution of the general foreign affairs powers to the executive branch. That's correct. But that does not give the executive branch the power or responsibility to adjudicate or resolve these claims. I think the issue here, Your Honor, is who has the power not to make foreign affairs policy, but to decide war crime claims, genocide claims. Nothing in the Constitution has ever been held by any court or asserted by the administration to give the executive branch the power to make those decisions. It does not exist. That power resides only in one body, and that's the judiciary. And I think there's good policy reason for this, as well as case law, even recent case law, that recognizes important government interests can conflict with judicial responsibility, but the judiciary still has to make the decision. A case that comes to mind, a very recent case, is U.S. v. Lynn. There, the President said, I have the power as Commander-in-Chief to decide who's a lawful combatant in war. I have the power under foreign affairs powers to make that decision. It's a political question in the Lynn case. And the Lynn court said that's not right. I have to look at whether there's a textual commitment to the judiciary and whether there are manageable judicial standards which this claim can be decided upon. And the court found despite the important government interests, there were manageable judicial standards and that the matter had been committed to judiciary, and it decided the case to not have a political question. I can't imagine in this day and age a bigger conflict here where we have terrorism being one of the number one priorities of the U.S. government, the government asserting a position, but the judiciary saying, I'm sorry, it's our job, as far back as Marbury v. Madison, to make this decision. Well, let's assume that we accept for now that you get into court and ATCA is a commitment to the judicial branch to decide claims brought for violations of international law. Judge Morrow went through it at elaborate length, based on a statement of interest from the State Department primarily, where she found that there was a very clear statement from the Papua New Guinea government and through the ambassadors and up to the State Department, which then having received that to her in response to her direct request to comment, and took the position that this litigation threatened the New Guinea peace process and other foreign policy interests. So why shouldn't that act as a caution and a constraint in this case in proceeding forward with this litigation? And again, I come back to the point I want in answering you to focus on, is that in this case, unlike Alvarez-McCain or Doe, there may be other cases you can go to that I'm intimately familiar with, the connections with the domestic United States were much more apparent than in this case, which is essentially coming to the United States to adjudicate violations of international law that took place halfway around the world. So what is it that we look to in the ATCA that tells us that, notwithstanding the expression of concerns of the State Department, the district court should nonetheless proceed to adjudicate this case, if that's what Congress in its wisdom back in the early days of the Republic had in mind? Well, if you look at the Kadick case and the Unital case, I understand the facts are different. I'll get to that in a moment. But what all the cases recognize is that when Congress gave the judiciary the power to adjudicate claims of aliens for violation of international law, as the Attorney General Bradford, we cite this in our brief, recognized once they did that, there was no question that there was going to be a tension between our government doing that and the foreign affairs with other countries. No country would ever want, particularly when you're talking about violations of international law, this court or what was happening in its borders in that respect, there's a potential for embarrassment, certainly. That's one of the Baker factors. But I think the courts have been clear that that is not the decisive factor. The decisive factor, again, is this textual commitment, which is here. Well, remind me. In those other cases you're mentioning, were there statements of interest presented by the State Department or were those just the arguments made in advance by the government-related entities or the parties in those cases? Well, in the Linds case, for example, it's not the State Department. The executive made the statement. In the Al Rehno-Weinberger case, the D.C. Circuit, again, the executive made a statement that it would be against our interests. In the other cases, in the Japan whaling case, the government of Japan made a statement and was very upset with, you know, the litigation that would forego what the executive had done with respect to the treaty about whaling. So there are cases where the judiciary goes against the wishes of a branch of government. Is there an ACCA case directly on point where the State Department has said, you know, we have concerns about the peace process, the government is objecting to it abroad? No, there is not. But I submit that that's not dispositive for two reasons. What's our standard of review, just by the way? Do we review Judge Morrow's decision on this, on abuse of discretion? No, it's a de novo review. De novo. I think both sides agree to that. To turn to a question or an issue on the foreign affairs doctrine and the political question doctrine, I think it's important here because you asked about the peace process. The right of an individual to have the judiciary decide a claim should not depend on the day-to-day or year-to-year position of the government. And here's why I say that. The case today, based on what the Papua New Guinea government said early in the case, said we don't want this case to go forward. Now, it could be in two years another U.S. administration will reexamine the current position of the Papua New Guinea government, which, as we note in the appendix, that it has no objection now to the case going forward, and then there will be a new analysis. I submit to the Court it cannot be that a letter expression on an issue not committed to the executive branch, it cannot be that that, which can change year-to-year, can decide whether or not this is a matter for the judiciary. Well, I don't read Judge Morrow saying it decides the issue. I think that's why I was asking about the standard of review. It's a factor, as I understand it, that she weighed under the Baker factors, took it into account and found that factors four and six weighed in favor of finding the political question doctrine applies here. And I would agree that we, well, at least from my own views, you don't give the State Department or anybody else an absolute veto power simply because they write a letter to the Why isn't P&G's statement through the State Department compelling? And, yes, if they change or the State Department changes its view in any event, they may update that or tell the Court they've changed their mind. But that isn't the case yet. The State Department hasn't done that. That's correct. There's a number of reasons. Number one, if you look at the Kadick case, and the Kadick case, when I was really the only case to address this, what do you do when you've found the textual commitment and you've found there are manageable standards? What do you do with the rest of the Baker factors? And what the Court there said, that those factors would only come in if there's a decision on the issue by the executive branch. There is no prior decision here. The executive branch's actions and interest in this came afterwards, after litigation. Second. But, Counsel, there had been a prior decision by the United States to become involved in New Guinea's affairs. We were, when this suit was filed, the United States had an ongoing relationship and had an interest in the resolution of a civil war and other things that were going on in Papua New Guinea. That's correct. But there had never been, I submit, the kind of decision on the issue, for example, the decision that the Kadick case is talking about, was there a decision by the executive on how to handle the war crime claims or the genocide claims? Why would our government have had to come to a resolution of that question on a matter affecting citizens of Papua New Guinea's claims against a foreign corporation arising out of Papua New Guinea? They would not. And that's why I submit there's not the kind of prior decision. But we're faulting the government for not having anticipated something that it couldn't possibly have anticipated. No, I'm not faulting the government. What I'm pointing out by that analysis is, again, that this is not, these claims are not something that our government, our State Department, has responsibility for. They may have an interest, a general interest, that there be peace in Papua New Guinea. That general interest does not, I submit, under the case law, trump this textual commitment to the judiciary. Well, there's a, and I don't want to overreach, but this has occurred to me, I think the courts of Belgium decided to criminally prosecute, I think, the Prime Minister of Israel for war crimes, reached out. What if somebody in this country decided to bring a lawsuit against Ariel Sharon for war crimes under the ATCA? Somebody who has standing? Pardon? Has standing, sure. So you're saying unless the United States government had taken a prior position on that, they couldn't come in and say, whoa, we've got the road to peace here, and this is the last thing we need to do is have a federal district court in Los Angeles adjudicating whether Sharon committed a war crime in his early days as a military person. You know, that's a difficult question. I think I would answer it that because the matter is committed through judiciary, that that matter should be decided by the judiciary. Now, there are other ways that Judge Morrow could have handled this that deal with your concern. The issue of whether there's jurisdiction and justiciability, I think, is largely resolved by the textual commitment. The issue of whether a matter might strain foreign relations, that could be handled not as a jurisdictional matter, but as a case management matter, because I think she had a duty to say, this is not a political question. I have concerns about how it's going to affect the peace process. That's a case management issue. She could have said, I'm going to put this case on hold for six months. We'll come back to it, see how things happen. And the danger here in allowing, and I see that I'm out of time, in allowing the statement of interest, again, to trump the judiciary is to look what happened. Before the Court, under Rio's own agreement, is the Second Amendment complaint. And as the Second Amendment complaint points out, by the time the judge is ruling, peace accords have been signed. The peace process is over with. So now we're in a situation where the very basis for the statement of interest doesn't exist. And, again, I think that points out why you can't let the day-to-day dealings of a government decide an issue that's committed to the judiciary. And what you're saying is we would never defer to the executive branch then in cases of this nature. I think, as the Kedick ---- Because you say that could change, I mean, in front of administration or whatever. So we would never defer to the executive branch. I think, as the Kedick Court noted, Your Honor, I think they used the words, it would be a rare case, as did Baker v. Carr and Japan Whaley. And I submit that this is not one of those cases. Counsel, can I get you to turn to the exhaustion matter? And I'd like you to address the following question, if you would. Let me ask sort of a series of questions and then ask you to respond. The judgment here, I believe, will be sort of res judicata to your clients. That is, if we were to affirm the district court on the grounds of, let's say, a political question, then your clients would have no further claims in U.S. courts. Is that correct? Even if the United States altered its policy or something broke down in Papua New Guinea, let's say, two years from now. That's correct. Counsel, if we were to decide that there is, and these are questions that I will have for the other side here in a minute, that there is some kind of international requirement, either in the cause of action or as a prudential matter, some kind of exhaustion requirement, then this matter would be effectively dismissed without prejudice. Isn't that right? Wouldn't you then have the opportunity of going back to Papua New Guinea, seeing your claims through whatever process the government there will or will not provide you, without prejudice to come back into U.S. courts, claim that the matter now has been exhausted in Papua New Guinea, and that you now have a right under the ATCA to bring the claim in U.S. courts? Well, that raises the exhaustion argument, so let me answer that in the following way. There is no, on the face of the statute, there's no exhaustion requirement. As the Cated Court noted when the Torture Victim Protection Act was amended, that the legislative history was clear that Congress wanted to I don't think that's the thrust of Judge Bybee's argument. That's in your briefs. All right. I think the question he's asking you is wouldn't you be better off with an exhaustion as opposed to losing an exhaustion? No, because as George Morrell found out, and this is the state of the record as of this moment, the plaintiffs, and this is in her opinion, are people who were hunted by the government of Papua New Guinea. They were in fear of their lives. They would not go back, as the record now stands, to Papua New Guinea, a place that hunted them, had a bounty for a period of time, and try to adjudicate their claims. So that's one problem. The second problem is it's absolutely clear, and the reason that Rio fought so hard to get the case sent to Papua New Guinea is that the claims are barred by the statute of limitations. So there would be, we would not even try to raise the claim in Papua New Guinea. Counsel, in informed nonconvenience cases, the district court occasionally will condition dismissal on informed nonconvenience on the basis that the party will waive the statute of limitations. Could a similar thing be done here? The judge asked Rio to do that, and Rio refused to do that. So we would be out of luck in Papua New Guinea. But there is one point that's not in the briefs on the exhaustion requirement. Okay, be quick, because you're into your time. Okay. I'll give you some time on rebuttal, but I don't want to turn this into a... This argument could go on all day, I recognize that. Okay, and it would be interesting to do so. If you read the sections of the restatement that Rio cites, Section 713, Note F, Restatement of Law and Foreign Relations, and 703D, I think you'll find that they require exhaustion in state-to-state actions. Mexico, for example, versus the United States. There is no exhaustion requirement in the restatement when an individual attempts to sue, and that makes sense for this reason. What Rio's argument boils down to is that one of the plaintiffs, who's a lawful resident of the State of California, who fled the country under their interpretation of ACCA, he has to go put himself in serious risk back to Papua New Guinea, risk getting arrested, thrown in jail, lost his claim. And if he doesn't have that requirement, as the Court in Talisman noted, into this act, then he would render it the act of futility. Thank you, Your Honors. Thank you. If I may please the Court, my name is Jack London. This is a case about a civil war, its causes, its conduct, its aftermath, and hopefully its resolution. Judge Morrow correctly acknowledged the applicability of the political question doctrine on the basis of a course of conduct and commitment by the United States government exercising its foreign policy powers that are beyond any question contextually committed under the Constitution. In 1998, Secretary of State Albright made a visit to Papua New Guinea and made a promise. She said to the Prime Minister, America will do everything it can to support the peace process. Then one year underway, after an uneasy truce, the arms have not yet been given up today by the rebels in Papua New Guinea, on Bougainville Island. It's not true that the peace process is over. There is a press statement that correctly states that certain bills have been passed. Taking all that, but Judge Morrow relied on the statement of interest, and there's a lot of stuff that both sides would like us to look at or the Court to look at. But what seems to be appropriate here is what did the State Department, conveying their position through the Justice Department, articulate as their response to her question for the Court to start engaging in looking at press conferences and statements of diplomats, which are directed at a different audience, I think is risky business. I take the point that Secretary Albright was obviously in support of the peace efforts in Papua New Guinea. But looking at the statement of interest, I was concerned that the statement seems a little bit qualified, and it's a little hard to tell how strongly the State Department really feels about this. They raise some concerns, no doubt about it, but is this something that Judge Morrow should or this Court should weigh, or is this dispositive on its face? Well, there is a weigh involved in invoking the political question doctrine, and the proper conclusion is the one Judge Morrow drew. That is to say there is a clear expression of a prediction of a serious risk of political consequences inconsistent with the foreign policy interests of the United States. That is expressly stated in the statement of interest and invokes a textual authority under the Constitution with respect to the U.S. support for a multilateral U.N.-sponsored peace accord. Well, can I just say, I want to make sure we're looking at the same language. So could you tell me what you take from the statement of interest that you're looking at there? Because I want to make sure we're looking at the same element. The statement of interest states that in our judgment at Executive Record 723, continued adjudication of the claims identified by Judge Morrow in our August 30 letter would risk a potentially serious adverse impact on the peace process and hence on the conduct of our foreign relations. That's what I thought you were referring to. Now the question is and is posed by counsel is that the peace process is a temporal element and there is some evidence in the record to suggest that things have moved beyond events that occurred that may have been fundamental to that statement. So the question is why wouldn't it have been appropriate, for example, as counsel is suggesting, not to throw this case out on political question, but to defer and postpone resolution to give time for the process to mature and see whether those concerns are really going to or should be affected. That's not the way the political process non-justiciability question works. On the record before Judge Morrow, she had to answer whether the claims could be adjudicated by her and properly invoking an expression of a serious risk of adverse impact on U.S. foreign policy found the case before her was not justiciable. I must disagree on that point with the res judicata question. I know it was raised on exhaustion, but it's relevant here. The res judicata is as to whether there is a political question, not any determination on the merits of the claims under Papua New Guinea law. The case can go forward in Papua New Guinea. Okay. But would it be, let's suppose that we were to dismiss on political question grounds and that six months, a year, two years from now, the situation were to change dramatically, could the plaintiffs come back into U.S. courts and refile this lawsuit? If we had dismissed on political question grounds. Would you argue that they had already had their shot, their bite at the apple and they weren't going to get a second shot in U.S. courts? Your Honor, this is a difficult question on which there's nothing on point. And I think the correct answer is that to the extent that nothing had changed that was material to the political question at that point, then it would be collaterally stopped. And basis for saying new information means that a case can be brought now that does not invoke the same foreign policy interests, then that claim could certainly be presented. And as I read the political question cases, it would present a new question. I don't think there can be ratio decata on what is the political impact based on development of a process between here and now, between now and then. State Department has said that the reconciliation process inherent in the Bougainville Peace Agreement needs to be allowed to work itself out. There are cases, the Nazi era cases, the Holocaust cases, in which there is an already settled claims process. In the In re Nazi era cases, it was a private agreement worked out by plaintiff's lawyers and German defendants which the State Department made an executive agreement to do what? To file statements of interest. That was the U.S. involvement, saying that the U.S. thinks this is good for our foreign relations. And that was done. And a claim by a U.S. citizen asserting a tort was properly dismissed on political question grounds because of the U.S. support for that foreign claims procedure. The Iranian — Those statements, as I recall, did not say that the case should be dismissed. It simply asserted what the governmental interest. Is that correct? That's correct, and the same in this case. Same in this case. That the case should be dismissed is for the court to determine, according to the political question doctrine, there's no executive veto here. What the political branches have a monopoly on is deciding what the interests of the United States are and predicting whether political events will call those interests into risk. And they have done that here. The dismissal of the case is still subject to the court, and the court reached it here. It is not true. It is too cramped an interpretation of the political question doctrine to say that it is not invoked unless the executive branch will decide the merits of the case instead of the judiciary, as counsel suggested. That's wrong. 767 Third Street about the disposition of the obligations under leases of a government, the Iranian claims cases, James and Moore, which Judge Fisher is familiar with. Painfully. It was a case in which what was at issue was not whether the executive is going to make decisions on the merits. What was at issue there was the executive's commitment to another way of adjudicating disputes. That case made it clear that at least ten times since. James and Moore was a far different case from this. I mean, Secretary Christopher had negotiated an agreement with the Iranians to resolve the claims, and the question was whether these pre-agreement attachments could nonetheless continue to be enforced. So, yeah, nigh as if we lost on that. But the problem here is that this is an evolving process, which is much more remote, if you will, to the United States interests. As Judge Bybee pointed out, this was a dispute going on down close to Australia, halfway around the world, and not one of our immediate spheres of concern of major proportion. So the fact that it was important at the time Secretary Albright made the statement, that is some aspect. But what has really emerged in this case is Judge Morrow asked a question, and within that you get back the answer that you quoted in part. And what is of some concern to me is in the weighing process, so that's why I make the contrast with James and Moore, which you invoked. In the weighing procedurary, how much weight do we give to this statement of interest as to whether it should weigh in favor of going forward? You say she could not have stayed the case and waited to let the process unfold some more. Is that absolute? I mean, there's no reason. There's nothing she could have done, case management or otherwise, to let this play out, because there is some extraneous evidence we've been asked to take judicial notice of, which is things may well have changed. So if they've changed now, or if they're mature now, you, in response to Judge Bybee, say, well, if you dismiss this case, come back in 12 months and say, whoa, this is just, you know, all of the predicates of the State Department's statement of interest have proved totally false, we should be allowed to go forward. Then that's the kind of evidence that would be presented in the new case. Why not present it in this case? There are a couple of moving parts, Your Honor, in my answer to Your Honor's question. One is the political question doctrine, how it's characterized. Is it an abstention doctrine, or is it a justiciability doctrine? Is it a doctrine about the competence of courts in the face of conflicting political entrustment of issues to the executive? In this case, the power to make and to support foreign treaties and agreements. Because it is treated as a question of justiciability, of whether the court should be involved at all, it's not a case-management matter, although there are other doctrines that are. Comedy could be invoked, alternatively, on a case-management basis. The political question is one that's where the courts are supposed to answer yes or no, based on a list of judgmental considerations. So was it error to do something that Judge Murrow was not asked to do by plaintiffs? She was not asked to stay the case. Now, second moving part, this Court's role in a case where things are changing over time. This Court's role on the record on which judgment was entered, judgment was properly entered. It can take into account what may happen and what may be the effects on the merits of the grounds below, based on changing facts, but its role still is to decide whether Judge Murrow got it right when she ruled. We've stated pretty clearly on an unclear question where we might have an interest in arguing the other way, that there may be a basis to come back if things really have changed from what the State Department anticipated, but not to skip any attempt at invoking the procedures that are available in Papua New Guinea and simply say, well, we'll assume because we don't want to be there that we can't be there and we'll come back when things have changed and tell you about them from a distance. No. No. What Judge Murrow took pains to make clear under the Comedy Doctrine was that the plaintiffs needed to be allowed to file their cases. She made us promise, and we did, that we would not invoke the Compensation Act. We did not waive the statutorial limitations, but it's not clear whether they'll be told or not. And as to what, this Court ought to make the decision about whether Judge Murrow got it right on the record before her. And that does not prejudge what may happen when the claims are brought, if they are, in Papua New Guinea. It's not a free pass to skip that step. Mr. Berman tries to have it both ways, saying that the reason that they can't proceed in Papua New Guinea is that there's a war on and they're still at war, and to say, on the other hand, that the peace process is done. Papua New Guinea should be allowed to work out the reconciliation process, the claims process, and to resolve these disputes consistent with an agreement the U.S. supports strongly. Mr. London, what are the difference, from your perspective, what are the consequences of this Court affirming the judgment below on the grounds of the political question doctrine versus this Court affirming the judgment below on the grounds of the exhaustion doctrine? On political question doctrine, there is res judicata as to whether there is a political question. And things can change in a way where the facts that are available to the Court on that judgment are no longer determinative. That's why I quarreled with the res judicata. In your view, there is the possibility that the plaintiffs could come back and file a second suit in U.S. courts at some future time and that we would not be obligated to dismiss that suit? Not necessarily, Your Honor. The courts would not necessarily be obligated to dismiss that suit. It would depend on whether anything new was added that had not been before the Court or capable of being before the Court. The res judicata does not sweep in like a release of all future claims. Anything that the Court really didn't and couldn't have passed. What's the difference, then, between deciding on political question and deciding on exhaustion? Well, exhaustion is in deference to the proceedings taking place in the other forum. If those proceedings show that there wasn't an adequate forum that was available if invoked, then that can be a basis to come back and that's a different set of questions on return. And we don't have the question of res judicata. No, you don't have the question of res judicata. As long as we are satisfied that somebody had attempted to exhaust remedies. Of course, that would raise a number of interesting questions. Correct. Is the exhaustion, is your exhaustion argument an argument that this is inherent in the ATCA or is it simply a prudential abstention by the Court? Both, Your Honor. Let me support that this way. The language of the statute is not determinative. It's a broad jurisdiction. It's a Marcos federal common law which incorporates international law standards. It does not define every aspect of what makes a claim actionable. For example, in Papa, this Court found that there's a statute of limitations. That's not in the statute. In fact, there's not an argument that Judge Morrow relied on to reject the exhaustion doctrine that wouldn't equally reject the statute of limitations. Why exhaustion for this claim? Why is there exhaustion as a matter of judicially created law, not any text, for claims against Native Americans that could be pursued in tribal courts? The U.S. Supreme Court has long recognized that because we're dealing with another sovereign's exercise of its judicial authority, there must be exhaustion before claims that it could be pursued in tribal courts can be pursued in the U.S. courts. Same with habeas corpus in ex parte royal. It was recognized that even though the habeas statute says the Court shall issue the writ, there's nothing about exhaustion in the text of the statute. And yet, because it's another sovereign's conduct, the State, an exhaustion requirement is required. Federal common law in this respect is clear because you're talking about deference to a judicial process of another sovereign. Exhaustion is the appropriate Federal common law remedy. It is also international law, and it is not limited to claims State to State. In fact, the Alien Tort Claims Act, its existence is consistent with the exhaustion requirement because it supplied a local remedy in the United States for aliens to bring claims here so that there would be no exception to the principles of exhaustion that could give rise to a cause for war. If that's the case, why did Congress go out of its way to incorporate it into the Torture Victims Protection Act, which is adjunct to the ATCA, incorporate that back into the? Well, first of all. It didn't want to undercut, it said, or to forget the exact word, but didn't want to undermine or whatever. That's not the right word, but the ATCA. The TVPA is something quite different from the Alien Tort Claims Act. It's not a creature of international law. It creates a domestic law violation actionable by citizens as well as aliens for certain kinds of acts that are defined there, not in international law. What the Congress said it was doing is creating a safe harbor for certain torts in light of questions raised under Taloran. It also said we're not doing anything to ATCA one way or another. We're not impairing it. We're not messing with it. And I don't. It's a little more articulate than my words. Well, Your Honor, I think it's quite unfair to say that or unreasonable to take a statute that was enacted to not intervene in the interpretation of the ATCA one way or another, but to create a safe harbor under domestic law instead of relying on international law with. And it's legislative history to say, you know, what we're doing on exhaustion is based on international law principles. I'm not we are not saying Judge Morrow did not correctly understand our argument. We didn't make it clear. We are not saying that the TVPA's enactment of an exhaustion requirement in that statute means that it is enacted in ATCA. No, that's not our argument. Well, I understand it. That's really the nature of my question. If Congress thought ATCA already had it in it, why did they put it in the TVPA? And vice versa, having referenced ATCA, why didn't they take the trouble to make it clear there as well? They thought it was ambiguous. Well, the TVPA created a domestic law subset, but not quite, overlapping in some respects. It invoked something that looks like international law as a defense, just like it invoked something that looks like international law in a subset as the basis for the claim. It couldn't rely on international law to read exhaustion into a domestic statute. So there's no mystery here. Mr. Lenton, did the plaintiffs raise a torture claim here? In broad terms, they did, but they can't. It's not brought under the TVPA. TVPA is not actionable against corporations. They can't sue my clients under the TVPA. But they did bring a torture claim under the ATCA. They used the word torture to talk about what was done by soldiers during the war. And that – I do not concede that that's a proper characterization, but that is not an issue that's determinative here. I have one comment about the international comedy, but I'm over my time. You can make the one comment. Your Honor, Judge Morrow invoked international comedy correctly and said she's dismissing everything that's covered by the Compensation Act, and she misinterpreted the scope of the Compensation Act because she said it applied to acts and events that arise under the business of mining. And the statute's words are, in any way in connection with. Those are of different scope. She's making a determination about foreign law. She got it right as far as she went, but she was too narrow in the scope she attributed to the Compensation Act. Thank you. I may have pleased the Court two very brief points. One, on the deference to be given the letter of the State Department. In the environmental tectronics case, the Court found that the State Department's letter predicting or speculating about an impact litigation might have to be not entitled to great deference in the Japanese litigation. I was in both cases. I think my memory is correct. The State Department vigorously opposed the litigation. They wrote a letter saying this litigation is not in the best interest of our foreign affairs. That's not what this letter does. Well, as long as we're making disclosures, I was involved in the statement of interest that the government filed. We speculated that you were in that. But not the final one. The issue of exhaustion. Yes, there has been a judicially creative exhaustion requirement in the habeas and the Indian affairs kind of issues. But there I think the Court was, in the Indian affairs issue, concerned about deferring to a sovereign. Here we're talking about an action against a corporation. And why would you impose this exhaustion requirement? Again, on an individual. To sue a corporation required an individual to travel to a place where they're being persecuted to sue this corporation that may at the time of the lawsuit not even be there. Where exhaustion is imposed, for example, under the Foreign Sovereign Immunities Act, it's on a sovereign state-to-state claim for a land-based claim, taking. With respect to transitory torts like we have here, Congress did not impose an exhaustion requirement. Thank you, Your Honors. The case just argued will be submitted. And we thank counsel on both sides for a very excellent argument on a very interesting case. We will stand in recess for the day. All rise. This Court for this session stands adjourned.
judges: Fisher, Bybee, Mahan